IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
SHELBY DIVISION

| | |
|---|---|
| Najah Sweat<br>7432 O Hara St<br>Huntersville, NC 28078<br><br>        Plaintiff,<br><br>        v.<br><br>CHARTER SCHOOLS USA AT LINCOLN<br>LLC D/B/A WESTLAKE PREPARATORY<br>ACADEMY<br>1691 Forney Creek Pkwy<br>Denver, NC 28037<br><br>    **Serve also:**<br>    CHARTER SCHOOLS USA AT<br>    LINCOLN LLC D/B/A WESTLAKE<br>    PREPARATORY ACADEMY<br>    c/o CT Corporation System<br>    160 Mine Lake Ct. Ste. 200<br>    Raleigh, NC 27615-6417<br><br>        Defendant. | **COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND ENDORSED**<br>**HEREIN** |

Plaintiff, Najah Sweat, by and through undersigned counsel, as her Complaint against Defendant, states and avers the following:

## PARTIES

1. Sweat is a resident of the city of Huntersville, county of Mecklenburg, state of North Carolina.

2. CSUSA at Lincoln LLC d/b/a Westlake Preparatory Academy ("Westlake") is a foreign limited liability company that operates a place of business located at 1691 Forney Creek Pkwy, Denver, NC 28037.

3. Westlake was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. 2000e-2 *et seq*.

## JURISDICTION & VENUE

4. Westlake hires citizens of the state of North Carolina, contracts with companies in North Carolina, and owns or rents property in North Carolina. As such, the exercise of personal jurisdiction over Westlake comports with due process.

5. This cause of action arose from or relates to the contracts of Westlake with North Carolina residents, thereby conferring specific jurisdiction over Westlake.

6. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1341 inasmuch the matters in controversy are brought pursuant to Civil Rights Act of 1964, 42 U.S.C. 2000e-2.

7. Venue is proper in this District because the wrongs herein alleged occurred in this District.

8. Within 300 days of the conduct alleged below, Sweat filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2024-02972 against Westlake operating at 1691 Forney Creek Pkwy, Denver, NC 28037.

9. On or about July 30, 2024 the EEOC issued and mailed a Notice of Right to Sue letter to Sweat regarding the Charges of Discrimination brought by Sweat against Charter Schools USA - Westlake Preparatory Academy in EEOC Agency Charge No. 430-2024-02972.

10. Sweat received her Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1) - which has been attached hereto as Plaintiff's Exhibit A.

11. Sweat has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

12. Sweat has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

13. Sweat is a former employee of Westlake.

14. Sweat worked for Westlake as a Middle School ELA Teacher.

15. Sweat was qualified for her position as a Middle School ELA Teacher.

16. Sweat is African American.

17. Sweat was one of three African American teachers working at Westlake.

18. Sweat was supervised by James Montague, Principal.

19. Montague is Caucasian.

20. Sweat was also supervised by Charlotte Beck, Vice Principal.

21. Beck is Caucasian.

22. In the 2023-2024 school year, Sweat taught a student named Brooklyn Utter.

23. Utter is Caucasian.

24. Utter had been expelled from the Westlake previously for racist behavior.

25. Utter's previous racist behavior included internet bullying and harassment.

26. Montague allowed Utter to return to Westlake for the 2023-2024 school year.

27. Montague had access to Utter's record before allowing Utter to return to Westlake.

28. Montague decided to allow Utter to return despite her record.

29. Throughout the 2023-2024 school year, Utter's behavior was the same as her previous behavior that had gotten her expelled.

30. Throughout the year, Sweat received reports from students that Utter had used the n-word at school ("Utter's N-Word Comments").

31. When Sweat received the reports from students, often two or more other students corroborated the reporting student's story.

32. Sweat frequently received reports from students about Utter's N-Word Comments.

33. Utter's N-Word Comments were directed at other students.

34. Utter's N-Word Comments were directed at Sweat.

35. Sweat informed Beck and Montague about Utter's N-Word Comments whenever she would receive student reports of Utter's N-Word Comments.

36. Beck did not discipline Utter for Utter's N-Word Comments.

37. Montague did not discipline Utter for Utter's N-Word Comments.

38. Beck did not discipline Utter for Utter's N-Word Comments purportedly because the comments "could not be substantiated."

39. Montague did not discipline Utter for Utter's N-Word Comments purportedly because the comments "could not be substantiated."

40. Utter displayed other, similar behaviors throughout the school year.

41. Utter frequently opposed Sweat's classroom management.

42. Utter opposed Sweat's classroom management by engaging in disruptive behavior.

43. Utter did not engage in the same disruptive behavior with Caucasian teachers.

44. Utter engaged in disruptive behavior because of Sweat's race.

45. Sweat reported Utter's disruptive behavior to Beck.

46. Sweat reported Utter's disruptive behavior to Montague.

47. Sweat reported that Utter engaged in Utter's disruptive behavior because Sweat's race.

48. Beck informed Sweat that she recognized that Utter's behavior was racist.

49. Beck did not take action sufficient to protect Sweat from Utter's racist conduct.

50. Montague did not take action sufficient to protect Sweat from Utter's racist conduct.

51. On or about March 26, 2024, Utter took a video of Sweat at an afterschool event.

52. After recording the video, Utter turned to other students and said "Compare this to a monkey." while referring to the video of Sweat. ("The Monkey Incident").

53. It is widely known that comparing African Americans to monkeys is a racial epithet.

54. Comparing African Americans to moneys is dehumanizing.

55. Being referred to as "this" is dehumanizing.

56. Being compared to, and referenced as, a monkey is a deeply offensive to an ordinary person.

57. Being compared to, and referenced as, a monkey is a deeply offensive to Sweat.

58. Being referred to as "this" is deeply offensive to an ordinary person.

59. Being referred to as "this" is deeply offensive to Sweat.

60. The Monkey Incident constitutes severe discrimination.

61. The Monkey Incident altered the terms of Sweat's employment.

62. After the Monkey Incident, Sweat made a written report of discrimination to Westlake. ("Sweat's Report of the Monkey Incident")

63. Sweat made Sweat's Report of the Monkey Incident to Beck.

64. Sweat made Sweat's Report of the Monkey Incident to Beck via text message.

65. In response to Sweat's Report of the Monkey Incident to Beck, Beck recognized it as "incredibly racist."

66. In response to Sweat's Report of the Monkey Incident to Beck, Beck informed Sweat that "As it stands- I'll make this clear tomorrow, but you do not have to interact with [Utter]."

67. Sweat responded, stating "Okay. What's happening to her? Because I can't deal with a talk, conference, conversations, none of that. We've been saying that there were underlying tones of racism but this is overt racism."

68. Beck replied, "You don't have to – and I wouldn't ask you to."

69. Utter was placed on a two week suspension for the Monkey Incident.

70. While Utter was on suspension, Beck and Montague confirmed with Sweat that Utter would be removed form Sweat's classroom.

71. On or about approximately April 11, 2024, Utter returned to school.

72. When Utter returned to Westlake, Utter went to Sweat's classroom.

73. When Utter went to Sweat's classroom, Sweat sent Utter to another teacher.

74. Instead of going to another teacher, Utter went to Montague.

75. Utter complained to Montague about the transfer to another classroom.

76. After Utter's complaint, Montague returned Utter to Sweat's classroom.

77. After returning Utter to Sweat's classroom, Montague informed Sweat that she would have to "just deal with it."

78. Montague did not take any action to protect Sweat from further discrimination.

79. By returning Utter to Sweat's classroom, Montague subjected Sweat to race discrimination.

80. After returning from suspension, Utter's behavior in Sweat's classroom did not change or improve.

81. Sweat reported Utter's continued racist behavior to Beck.

82. Sweat reported Utter's continued racist behavior to Montague.

83. Neither Beck nor Montague took action to stop Utter's racial discrimination against Sweat.

84. Utter's racial discrimination against Sweat altered the terms of Sweat's employment.

85. On or about May 21, 2024, Sweat resigned from her employment.

86. Sweat was forced to resign from her employment.

87. Sweat was forced to resign from her employment due to the hostile work environment that Beck and Montague fostered by returning Utter to Sweat's classroom despite the Monkey Incident.

88. Westlake constructively terminated Sweat.

89. On or about May 22, 2024, Sweat explained her constructive termination to Westlake.

90. Sweat sent an email to Shana Gainey Mayo, Westlake's Human Resources representative. ("Sweat's Post-Termination Email").

91. In Sweat's Post-Termination Email, Sweat explained that she resigned because of the discrimination that Westlake failed to remedy.

92. In Sweat's Post-Termination Email, Sweat explained that she resigned because of the discrimination that Beck failed to remedy.

93. In Sweat's Post-Resignation Email, Sweat explained that she resigned because of the discrimination that Montague failed to remedy.

94. Westlake did not remedy the discrimination Sweat suffered.

95. Upon information and belief, Westlake informed Beck of the contents of Sweat's Post-Termination Email.

96. Upon information and belief, Westlake informed Montague of the contents of Sweat's Post-Termination Email.

97. After Sweat was constructively terminated, she found employment at Gym Fit Sports.

98. While at Gym Fit Sports, Sweat's supervisors received an email. (the "Retaliatory Email")

99. The Retaliatory Email contained allegations of poor work performance against Sweat.

100. The Retaliatory Email's allegations were false.

101. The Retaliatory Email claimed to be an email from a parent.

102. The Retaliatory Email contained allegations that only Beck or Montague would know about.

103. Upon information and belief, Montague sent the Retaliatory Email.

104. Upon information and belief, Beck sent the Retaliatory Email.

105. The Retaliatory Email encouraged Sweat's new supervisors to terminate Sweat's employment.

106. The Retaliatory Email was sent because of Sweat's Post-Termination Email.

107. The Retaliatory Email was sent because of Sweat's race.

108. The Retaliatory Email was sent because of Sweat's complaints about Utter's conduct.

109. The Retaliatory Email constitutes post-employment retaliation.

110. On or about August 8, 2024, Montague released Sweat's personal contact information to parents.

111. Montague released Sweat's personal contact information to parents and blamed Sweat for transportation problems.

112. Sweat never had responsibilities for transportation while at Westlake.

113. Montague's statement to parents was false.

114. Upon information and belief, after Sweat's termination of employment, Defendants hired or retained an individual outside of Sweat's protected class to replace Sweat.

115. As a result of Defendant's conduct, Sweat suffered, and will continue to suffer damages.

### COUNT I: <u>RACE DISCRIMINATION IN VIOLATION OF TITLE VII</u>

116. Sweat restates each and every prior paragraph of this complaint as if it were fully restated herein.

117. Pursuant to 42 U.S.C. § 2000e-2(a)(1), it is an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

118. Throughout her employment, Sweat was fully competent to perform his essential job duties.

119. Westlake treated Sweat differently than other similarly situated employees based on her race.

120. Westlake took adverse employment action against Sweat because of her race.

121. On or about May 21, 2024, Westlake terminated Sweat's employment because of her race.

122. As a result of Westlake's discrimination against Sweat in violation of 42 U.S.C. § 2000e-2(a)(1), Sweat has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Sweat to compensatory monetary relief.

123. As a result of Westlake's discrimination against Sweat in violation of 42 U.S.C. § 2000e-2(a)(1), Sweat has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

124. To remedy the violations of the rights of Sweat secured by 42 U.S.C. § 2000e-2(a)(1), Sweat requests that the Court award her the relief prayed for below.

## COUNT II: <u>RETALIATION IN VIOLATION OF TITLE VII</u>

122. Sweat restates each and every prior paragraph of this complaint, as if it were fully restated herein.

123. Pursuant to 42 U.S.C. § 2000e-3(a), it is an unlawful employment practice for an employer to discriminate against an employee for participating in a protected activity.

124. On or about February 13, 2024, Sweat participated in a protected activity when she complained to Gainey Mayo about the discrimination she was experiencing.

125. On or about May 22, 2024, Sweat participated in a protected activity when she complained to Gainey Mayo about the discrimination she experienced.

126. On or about May 21, 2024, Westlake constructively terminated Sweat's employment.

127. Westlake constructively terminated Sweat in retaliation for complaining about the discrimination she was experiencing.

128. In or around June 2024, Westlake sent Sweat's subsequent employer the Retaliatory Email.

129. Westlake sent the Retaliatory Email because of Sweat's protected activity.

130. As a result of Westlake's retaliation against Sweat in violation of 42 U.S.C. § 2000e-2(a)(1), Sweat has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Sweat to compensatory monetary relief.

131. As a result of Westlake's retaliation against Sweat in violation of 42 U.S.C. § 2000e-2(a)(1), Sweat has suffered mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

132. In its discriminatory actions alleged above, Westlake acted with malice or reckless indifference to the rights of Sweat, thereby entitling Sweat to an award of punitive damages.

133. To remedy the violations of the rights of Sweat secured by 42 U.S.C. § 2000e-2(a)(1), Sweat requests that the Court award her the relief prayed for below.

## COUNT III: **HOSTILE WORK ENVIRONMENT ON THE BASIS OF RACE DISCRIMINATION**

134. Sweat restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

135. During Sweat's employment with Defendant, she was subjected to offensive and harassing conduct by Utter based on Sweat's race.

136. Defendant became aware of the harassing conduct against Sweat by Sweat's complaints to Montague, Beck, and Defendant's human resources personnel.

137. Defendant condoned, tolerated and ratified this harassing conduct.

138. This harassing conduct was severe and/or pervasive.

139. This harassing conduct was offensive to Sweat.

140. This harassing conduct interfered with Sweat's ability to perform her job duties.

141. Defendant's offensive and harassing conduct created a hostile and/or abusive work environment for Sweat.

142. Defendant's offensive and harassing conduct created a hostile and/or abusive work environment for the reasonable person similarly-situated to Sweat.

143. As a result of Defendant's harassing conduct, Sweat was compelled to resign from her employment.

144. Plaintiff suffered emotional distress as a result of Defendant's conduct, and is entitled emotional distress damages.

145. As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered and will continue to suffer damages, including economic and emotional distress damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Najah Sweat demands from Defendants the following:

(a) Issue an order requiring Charter Schools USA - Westlake Preparatory Academy to restore Sweat to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Sweat for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $ 25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $ 25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Sweat's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ *Evan G. Gungor, Esq.*

Evan Gungor (60902)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
5540 Centerview Drive
Suite 200B
Raleigh, NC 27606
Phone: (980) 332-4688
Fax:    (216) 291-5744
Email: evan.gungor@spitzlawfirm.com

*Attorneys For Plaintiff*
*Najah Sweat*

## JURY DEMAND

Plaintiff Najah Sweat demands a trial by jury by the maximum number of jurors permitted.

/s/ *Evan Gungor*
Evan G. Gungor, Esq. (60902)